UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE | : | Chapter 11 |
| | : | |
| SCUNGIO BORST AND ASSOCIATES LLC, | : | |
| | : | Bankruptcy No. 22-10609-AMC |
| DEBTOR | : | |
| | : | |
| STEPHEN J. SCHERF, SBA PLAN TRUST ADMINISTRATOR OF SBA PLAN TRUST, | : | |
| | : | |
| PLAINTIFF | : | Adv. Proc. No. 24-00039-AMC |
| V. | : | |
| FINANCIAL RESOURCES FEDERAL CREDIT UNION, | : | |
| | : | |
| DEFENDANT | : | |

Ashely M. Chan, United States Bankruptcy Judge

**OPINION**

### I.  INTRODUCTION

In this adversary proceeding, Financial Resources Federal Credit Union ("FRFCU" or "Defendant") moves for summary judgment, arguing that certain undisputed material facts establish that transfers Defendant made to Scungio Borst & Associates ("Debtor") during the ninety (90) days preceding the petition date are protected from avoidance by the ordinary course of business defense under 11 U.S.C. § 547(c)(2)(A). Stephen J. Scherf ("Plaintiff" or "Trust Administrator," collectively with Defendant, "Parties") contends that there are genuine disputes of material fact that preclude application of the ordinary course of business defense on summary judgment.

1

As explained below, the Court agrees with Plaintiff that there are genuine disputes of material fact that preclude the entry of summary judgment based on the ordinary course of business defense to the avoidance of preferential transfers. It follows that summary judgment is also precluded as to recovery of avoided preferential transfers and for disallowance of Defendant's claims. Because the Parties concede that the cause of action for avoidance of fraudulent conveyances is moot, summary judgment is granted for that cause of action.

## II.     PROCEDURAL BACKGROUND

On March 11, 2022 (the "Petition Date"), Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Case No. 22-10609 ECF No. ("ECF") 1. On January 17, 2024, the Bankruptcy Court entered an order (the "Confirmation Order") confirming the Modified Joint Plan of Liquidation (the "Plan") proposed by Debtor, the Debtor-in-Possession, and the Official Committee of Unsecured Creditors. *Id.* at ECF 387. Pursuant to the Confirmation Order, the SBA Plan Trust was created, and Plaintiff was appointed as the SBA Plan Trust Administrator. *Id.* On March 8, 2024, Plaintiff initiated an adversary proceeding by filing a complaint ("Complaint") against Defendant. Case No. 24-00039 ECF 1.[1]

Prior to the Petition Date, Defendant provided loans to Debtor. ECF 1 ¶ 11. The Complaint sets forth four counts against Defendant: (i) count I seeks to avoid all of the transfers of an interest of Debtor's property by Debtors to Defendant during the ninety (90) day period before the Petition Date totaling not less than $150,620.17 (the "Transfers"), as preferential transfers pursuant to Bankruptcy Code § 547 ("Count I"); (ii) count II seeks to avoid the Transfers as fraudulent transfers pursuant to Bankruptcy Code § 548 ("Count II"); (iii) count III seeks to recover avoided transfers pursuant to Bankruptcy Code § 550 ("Count III"); and (iv) count IV seeks to disallow

---

[1] All citations to ECF that follow refer to the adversary proceeding at Case No. 24-00039.

Defendant's claims pursuant to Bankruptcy Code § 502(d) and (j) ("Count IV"). *Id.* at ¶¶ 15-45; *see* 11 U.S.C. §§ 547, 548, 550 & 502(d) and (j).

On March 22, 2024, Defendant filed an answer to the Complaint asserting the affirmative defense that the Transfers were made in the ordinary course of business. ECF 4 ¶ 31; *see* 11 U.S.C. § 547(c)(2)(A).

Currently before the Court is Defendant's motion for summary judgment, filed on August 28, 2024, seeking summary judgment on Counts I through IV of the Complaint pursuant to Fed. R. Civ. P. 56(b) (the "Motion"). ECF 14.

Defendant argues that this Court should grant summary judgment in its favor on Count I because the Transfers were made in the ordinary course of business and cannot be avoided pursuant to Bankruptcy Code § 547(c)(2)(A). ECF 14-3 at 5. In support of its Motion, Defendant provides an affidavit by FRFCU's Member Solutions Manager, Judith Barta, along with an SBA Form 147, rate change history, billing statements, past due notices, loan transaction histories, and loan payment summaries. *See* ECF 14-1; ECF 14-4 to 14-9. Next, Defendant argues for summary judgment on Count II because there is no dispute that the Transfers were made on account of antecedent debt and therefore are not fraudulent. ECF 14-3 at 11; s*ee* § 548(d)(2). Finally, Defendant argues that, because the relief in Counts III and IV are dependent on avoidance of the Transfers under Counts I and II, summary judgment in its favor on Counts III and IV must follow. ECF 14-3 at 11.

On September 18, 2024, Plaintiff filed its opposition to Defendant's Motion, contending that: (a) the Transfers are preferential, and (b) Defendant failed to establish an ordinary course of business defense, because (i) the parties had a wholly unordinary relationship, as the loans at issue were managed in Defendant's collections department for nearly its entire relationship with the

3

Debtor; (ii) Defendant's relationship with Debtor was too short to establish an ordinary course; (iii) payments were made significantly later during the preference period than during the historical period; and (iv) Defendant engaged in repeated and persistent dunning of Debtor by phone and email during the preference period. *See* ECF 18-2.

### III.   UNDISPUTED FACTS

On March 20, 2020, Debtor borrowed $4,430,000 from Defendant (the "First Loan") under the loan program of the Small Business Administration (the "Administration"). ECF 14-2 ¶ 1. On the same date, Debtor borrowed an additional $350,000 from Defendant under the Administration's express loan program (the "Second Loan"). *Id.* at ¶ 3. The first six payments on each of the Loans were made by the Administration under the CARES Act and not by Debtor. *Id.* at ¶ 20. Throughout the life of the Loans, Debtor primarily made its payments by check. *Id.* at ¶ 11.

At issue in this proceeding are five late payments made from December 11, 2021, to the Petition Date, March 11, 2022 (the "Preference Period"), totaling $150,656.62[2]. *See* ECF 14-9 Ex. F. The undisputed information pertinent to these payments is summarized as follows:

**TABLE 1**

|  | **Preference Period** | | | |
| --- | --- | --- | --- | --- |
| Transfer No. | Loan | Check No. | Date | Amount Paid |
| 1 | Both | 13025 | 12/17/2021 or 12/20/2021 | $50,199.72 |
| 2 | Both | 13058 | 1/19/2022 | $50,199.72[3] |

---

[2] Under the Court's calculations using the provided loan histories, this is the correct total Transfer amount. *See* ECF 14-9 Ex. F ("Loan Histories"). Defendant asserts a total—$150,620.17—that does not account for the fifth Transfer. *See* ECF 14-2 ¶ 17. Plaintiff asserts a total—$150,677.63—which is inconsistent with the Loan Histories. *See* ECF 18-1 ¶ 54; ECF 14-9 Ex. F.

[3] Although Plaintiff asserts two different numbers in his Response regarding the Second Transfer, $50,199.72 is the correct Transfer amount. *See* ECF 18-1 ¶ 18; ECF 18-6 Ex. D; *see also* ECF 14-9 Ex. F.

| 3 | Second | e-transfer | 1/25/2022 | $21.01 |
| 4 | Both | 1319 | 3/2/2022 | $50,199.72 |
| 5 | Second | e-transfer | 3/3/2022 | $36.45 |

### IV. DISCUSSION

For the reasons that follow, the Court concludes that Plaintiff's statement of facts and supporting evidence establish that there is a genuine dispute as to whether the Transfers qualify for the ordinary course of business exception under § 547(c)(2). Specifically, Plaintiff has raised a triable issue of whether Defendant engaged in unusual collections activity to obtain the Transfers. Therefore, summary judgment as to Count I will be denied.

Plaintiff concedes that Defendant has provided evidence that the Preference Period Transfers were each on account of antecedent debts, rendering Plaintiff's fraudulent conveyance claim moot. Therefore, summary judgment as to Count II will be granted.

As summary judgment on Count I is denied, it follows that the Court must also deny summary judgment as to Counts III and IV.

#### A. Applicable Legal Principles

##### i. Federal Rule of Civil Procedure 56

Pursuant to Federal Rule of Civil Procedure 56(a) ("Rule 56"), applicable to bankruptcy adversary proceedings through Federal Rule of Bankruptcy Procedure 7056, "[t]he court shall grant summary judgment if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). The duty of a court on a motion for summary judgment is not to determine the truth of the matter or to resolve

issues of fact, but to determine whether genuine and material issues are present. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

A genuine issue of material fact arises when there is sufficient evidence that would permit a reasonable fact finder to return a verdict for the non-moving party. *See Odom v. Philadelphia Parking Auth. (In re Odom)*, 571 B.R. 687, 692 (Bankr. E.D. Pa. 2017) (citing *Anderson*, 477 U.S. at 248). A material fact is one which could alter the outcome of the case, and a dispute is genuine when reasonable minds could disagree on the result. *Burtch v. Detroit Forming, Inc. (In re Archway Cookies)*, 435 B.R. 234, 238 (Bankr. D. Del. 2010) (citing *Horowitz v. Federal Kemper Life Assurance Co.*, 57 F.3d 300, 301 (3d Cir. 1995).

### ii. Avoidable Transfers: § 547(b)

Under 11 U.S.C. § 547(b), a trustee may avoid any transfer of an interest of the debtor in property if five conditions are satisfied, namely, that the transfer was:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
>     (A) the case were a case under chapter 7 of this title [11 USCS §§ 701 et seq.];
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title [11 USCS §§ 101 et seq.].

Each one of these elements must be proven for a transfer to be avoidable as a preference under 11 U.S.C. § 547(b). *Stanziale v. Southern Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 277 (Bankr. D. Del. 2014) (citing *Waslow v. The Interpublic Group of Cos., Inc. (In re M Group, Inc.)*, 308 B.R. 697, 700 (Bankr. D. Del. 2004); *In re IT Grp., Inc.*, 331 B.R. 597, 601

6

(Bankr. D. Del. 2005)). The burden of proof for these elements is on the Trustee. 11 U.S.C. § 547(g).

Here, the Parties agree that the Transfers were made (1) to Defendant as a creditor, (2) on account of antecedent debt for the First and Second Loans, (3) while Debtor was presumptively insolvent, (4) during the Preference Period. ECF 14-3 at 4. However, Defendant contends that, even if the Transfers are preferential transfers for purposes of § 547(b), they cannot be avoided because they were made in the ordinary course of business between Defendant and Debtor. *Id.*; *see* § 547(c)(2).

### iii. Ordinary Course of Business Defense: § 547(c)(2)

Section 547(c) provides exemptions to transfers that are otherwise avoidable as preferences. *In re Conex Holdings, LLC*, 518 B.R. at 279 (citing *Archway Cookies,* 435 B.R. at 240 (citation omitted)). The party contending that a transfer falls under a § 547(c) exemption bears the burden of proving the assertion by a preponderance of the evidence. § 547(g).

Under § 547(c)(2), "[t]he trustee may not avoid under this section a transfer… to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was—(A) made in the ordinary course of business of the debtor and transferee; or (B) made according to ordinary business terms." 11 U.S.C. § 547 (c)(2). The purpose of the ordinary course defense is to "protect recurring, customary credit transactions which are incurred and paid in the ordinary course of business of the debtor and the transferee . . . and to leave undisturbed normal financial relations…." *McLaughlin v. Hoole Mach. & Engraving Corp. (In re Parkline Corp.)*, 185 B.R. 164, 168 (Bankr. D.N.J. 1994) (citing *In re Jolly "N", Inc.*, 122 B.R. 897, 905 (Bankr. D.N.J. 1991) (quoting H.R. Rep. No. 95-595, 95th Cong., 1st Sess., 373-74 (1977), reprinted in U.S. Code Cong. and Admin.

7

News 1978, pp. 5787, 6329, 6330). To protect a transfer from avoidance, a defendant need only prove either that the transfer was in the ordinary course of business between the parties or that the transfer was in the ordinary course of business under industry norms. *In re Conex Holdings, LLC*, 518 B.R. at 279; *see* 5 Collier on Bankruptcy ¶ 547.04[2] (Richard Levin & Henry J. Sommer eds., 16th ed. 2024) ("Collier").

Here, Defendant contends only that the Transfers were made in the subjective ordinary course of business between Defendant and Debtor. Therefore, the Court will consider whether the undisputed material facts qualify the Transfers for the ordinary course of business defense as a matter of law under § 547(c)(2)(A).

### iv. Subjective Ordinary Course of Business: § 547(c)(2)(A)

To determine if preference period transfers were made in the ordinary course of business between parties, courts consider various factors to understand the parties' historical relationship. *See Goldstein v. Starnet Capital Group, LLC (In re Universal Mktg.)*, 481 B.R. 318, 326 (Bankr. E.D. Pa. 2012) (citing *Sass v. Vector Consulting, Inc. (In re American Home Mortg. Holdings, Inc.)*, 476 B.R. 124, 135-36 (Bankr. D. Del. 2012)). These factors include:

> (1) the length of time the parties have engaged in the type of dealing at issue;
> (2) whether the subject transfer was in an amount more than usually paid;
> (3) whether the payments were tendered in a manner different from previous payments;
> (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt;
> (5) whether the creditor took any action to gain an advantage, such as gaining additional security, in light of the debtor's deteriorating financial condition.

*See, e.g., In re Universal Mktg.*, 481 B.R. at 326-327 (citations omitted). However, no single factor is determinative. *In re Conex Holdings,* LLC, 518 B.R. at 280 (citing *Burtch v. Revchem Composites, Inc. (In re Sierra Concrete Design, Inc.)*, 463 B.R. 302, 306 (Bankr. D. Del. 2010)). A significant alteration in any one of the five factors above may be sufficient to conclude that a

8

payment was made outside the ordinary course of business. *In re Universal Mktg.*, 481 B.R. at 327 (citing *In re Furr's Supermarkets, Inc.*, 373 B.R. 691, 706 (B.A.P. 10th Cir. 2007) (citation omitted).

### B. Factor 1: Length of Relationship

#### i. Historical Period Dates

To assess whether transfers were made in the ordinary course of business, the Court must first determine what the ordinary course of business was during the pre-preference period. *In re Conex Holdings, LLC*, 518 B.R. at 280. A defendant must establish a "baseline" of dealing so that the Court can compare payments made during the preference period with those made during the parties' prior course, referred to as the historical period. *In re Universal Mktg.*, 481 B.R. at 327 (citing *In re Hancock-Nelson Mercantile Co. Inc.*, 122 B.R. 1006 (Bankr. D. Minn. 1991); *accord In re Quad Systems Corp.*, 2003 Bankr. LEXIS 2358, 2003 WL 25947345, at *6 (Bankr. E.D. Pa. July 15, 2003)). This baseline should include a period "well before the preference period." *In re Universal Mktg.*, 481 B.R. at 325 (citing *Fiber Lite Corp. v. Molded Acoustical Products (In re Molded Acoustical Products)*, 18 F.3d 217, 223 (3d Cir. 1994)); *see also Forklift LP Corp. v. Spicer Clark-Hurth (In re Forklift LP Corp.)*, 2006 U.S. Dist. LEXIS 50264, *26-27 (D. Del. July 20, 2006) (declining to cut down the historical period to defendant's proposed nine-month period where the defendant presented no explanation as to why the "entire [24-month] historical period" should not be used) (citing *In re Molded Acoustical Products*, 18 F.3d at 223)). "Preferably, this historical period should extend back into the time before Debtor became financially distressed." *In re Universal Mktg.*, 481 B.R. at 326 (citing Collier at ¶547.04[2][a][ii] (citations omitted)).

Here, the parties agree that Debtor borrowed the First and Second Loans on March 20, 2020. ECF 18-2 at 8. They agree, furthermore, that the first six Loan payments were paid by the

9

Administration pursuant to the CARES Act. ECF 18-1 ¶ 56. The parties disagree, however, over which dates should comprise the historical period. Defendant argues that the historical period should be from March 11, 2021, to December 10, 2021. ECF 14-3 at 2. The only explanation Defendant offers for this date range is that it includes the year prior to the Petition Date. *Id.* Plaintiff contends that the historical period should instead be from November 2020 to December 10, 2021. ECF 18-2 at 2. Plaintiff explains that this period encompasses the pre-Preference Period time where Debtor was solely responsible for making the monthly payments on the Loans. *Id.* It therefore excludes the period in which the U.S. government was making payments pursuant to the CARES Act but takes into account all other payments made on the Loans by Debtor. *Id.*[4]

As discussed, numerous courts have held that the historical period should extend back "well before the preference period." It follows that the Court should not arbitrarily exclude the months of November 2020 to February 2021 as proposed by Defendant. *See, e.g., In re Universal Mktg.,* 481 B.R. at 325. Therefore, the Court will treat the historical period as November 1, 2020—the first payment made by the Debtor on the Loans— to December 10, 2021—the last day before the Preference Period began ("Historical Period"). *See* Table 2.

## ii. Adequacy of Historical Period Length

When a debtor and a transferee have been engaged in business for a significant period prior to the preference period, courts can simply compare the historical dealings of the parties with their preference period dealings to determine whether the transfers were made in the ordinary course.

---

[4] There is case law that supports the assertion that the CARES payments were not part of the parties' ordinary course of business, and thus that they should be excluded from the historical period. *Cf. Grant v. Sun Bank/North Cent. Fla. (In re Thurman Constr.)*, 189 B.R. 1004 (Bankr. M.D. Fla. 1995) (payments made to creditor by a third party on behalf of the debtor were not in the ordinary course, because such a triparte structure was not consistent with other loans between the creditor and the debtor); *cf. In re Destileria Nacional, Inc.*, 2021 Bankr. LEXIS 281 (Bankr. D.P.R. Feb. 5, 2021) (application for a Payment Protection Program Loan to provide emergency assistance for the 2020 coronavirus pandemic was "clearly not in the ordinary course of business" because the program "exists because there are extraordinary circumstances").

*Pirinate Consulting Grp., LLC v. Md. Dep't of the Env't (In re Newpage Corp.)*, 555 B.R. 444, 453 (Bankr. D. Del. 2016) (citing *Stanziale v. Indus. Specialists Inc.*, 522 B.R. 480, 487 (Bankr. D. Del. 2014) (citation omitted). When the historical relationship between the creditor and debtor has existed for a relatively short time, however, "[t]he Court must do the best it can with the evidence before it as to the parties' relationship." *In re Conex Holdings, LLC*, 518 B.R. at 282.

The ordinary course defense can still apply to parties who had a short period of dealing, so long as the court has enough information to discern a pattern of behavior between the parties. In *In re Universal Marketing*, a historical period as short as five months and an entire relationship of only eight months did not preclude an ordinary course defense, as the transaction history was "sufficient to demonstrate a general pattern of behavior." 481 B.R. at 328. There, the transaction history included seven payments total, with five payments during the historical period and two during the preference period. *Id.* at 327.

As discussed above, the Historical Period here stretches from November 1, 2020, to December 10, 2021, lasting approximately thirteen months. Despite Plaintiff's contentions that a thirteen-month historical period relationship is too short to establish an ordinary course, courts have found historical periods significantly less than thirteen months sufficient to apply the ordinary course defense. *See, e.g.*, *In re Universal Mktg.*, 481 B.R. at 328. Therefore, the length of Defendant's relationship with Debtor is not so short as to preclude an ordinary course defense so long as sufficient evidence exists establishing historical patterns, which the Court proceeds to consider.

C. **Factor 2: Amount of Transfers**

Plaintiff does not contend that the amounts of the Transfers were more than what was usually paid during the Historical Period.

D. **Factor 3: Manner of Payment of Transfers**

11

There is a presumption that payments made outside of the payment terms—including late payments—fall outside the ordinary course of business. *In re Conex Holdings, LLC*, 518 B.R. at 283 (citing *In re TWA, Inc. Post Confirmation Estate*, 327 B.R. 706, 709 (Bankr. D. Del. 2005)). However, a defendant can rebut this presumption by showing that that the debtor regularly tendered late payments as part of the normal practice between the parties. *Id.* (citations omitted).

Whether the difference between historical and preference period payment times is substantial enough to be considered outside of the ordinary course of business is a fact-specific inquiry. *In re Universal Mktg.*, 481 B.R. at 327 (citing *J.P. Fyfe, Inc. of Florida v. Bradco Supply Corp.*, 891 F.2d 66, 70 (3d Cir. 1989)). There is no single formula a court must use. *Stanziale v. Superior Tech. Res., Inc. (In re Powerwave Techs.)*, 2017 Bankr. LEXIS 1023, *12 (Bankr. D. Del. April 13, 2017) (citing *Menotte v. Oxyde Chem., Inc. (JLS Chem. Corp.)*, 424 B.R. 573, 581 (Bankr. S.D. Fla. 2010). Application of a variety of mathematical processes may be appropriate, including consideration of range, averages, and weighted percentages. *In re Powerwave Techs.*, 2017 Bankr. LEXIS 1023 at *12 (citing *Moltech Power Sys. v. Tooh Dineh Indus. (In re Moltech Power Sys.)*, 327 B.R. 675, 681 (Bankr. N.D. Fla. 2005)).

Here, the parties include calculations based on both ranges and average payment times. However, Defendant only includes three Transfers in its calculation of payment timing, electing to exclude Transfers 3 and 5. ECF 14-2 ¶ 55. Defendant explains that it excludes Transfer 3 from its calculations because "it is an Interest Shortage Payment, and it is a de minimus amount." *Id.* Defendant provides no legal basis for this exclusion. As for Transfer 5, Defendant acknowledges that it made this Transfer within the Preference Period but avers that the payment is not specifically listed in the Complaint. *Id.* at ¶ 21-22. As there is no dispute that Debtor made the five Transfers during the Preference Period, the Court includes Transfers 3 and 5 in its analysis.

### i. Ranges

Courts have concluded that comparing ranges of payment times between the historical period and preference period is a useful means of determining of whether payments fall within the ordinary course. *See, e.g., In re Managed Storage Int'l, Inc.*, 601 B.R. 261, 267 (Bankr. D. Del. 2019). Payments made in the preference period are deemed in the ordinary course of business when made within the range of the historical period. *Id.* (citing *In re FBI Wind Down, Inc.,* 581 B.R. 116, 141 (Bankr. D. Del. 2018)).

Under the Court's calculations[5], the Historical Period payments ranged from 2 to 29 days late and the Preference Period payments ranged from 16 to 30 days late. *See* Table 2; *see also* ECF 14-9 Ex. F. As such, the timing of the Transfers during the Preference Period falls within the Historical Period range.

### ii. Averages

If the average timing of payments changes significantly during the preference period, preference period payments will be deemed outside of the ordinary course of business. *In re Newpage Corp.*, 555 B.R. at 453 (citing *Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, 2010 Bankr. LEXIS 3941, at *3 (Bankr. S.D.N.Y. 2010). That said, small deviations in timing between historical period and preference period payments may not be so significant as to defeat the ordinary course defense, while greater deviations may. *In re Archway Cookies*, 435 B.R. at 243 (citations omitted).

Under the Court's calculations, the average timing of payments during the Historical Period was 12.8 days late for the First Loan and 16.5 days late for the Second Loan. *See* Table 2. The

---

[5] The Court's calculations apply the correct Historical Period of November 1, 2020, to December 10, 2021. Furthermore, the Court uses the payment dates provided in the Loan Histories. *See* ECF 14-9 Ex. F. The Court's calculations differ from Plaintiff's, as Plaintiff made what appear to be errors as to certain dates and calculations. *See* Table 2.

average timing during the Preference Period was 23.4 days late for both Loans. *Id*. Therefore, the difference in average payment lateness between the Historical Period and the Preference Period was 10.6 days for the First Loan and 6.9 days for the Second Loan. *See* Table 2. The Court does not find this difference so significant as to preclude application of the ordinary course of business defense. *See e.g.*, *In re Universal Mktg.*, 481 B.R. 318 (a 4-day difference in "average lag" between historical payments and preference period payments did not warrant avoidance); *Huffman v. New Jersey Steel Corp. (In re Valley Steel Corp.)*, 182 B.R. 728 (Bankr. W.D. Va. 1995) (a 13-day difference in timing between average historical and preference period payments did not take the payments out of the ordinary course); *Branch v. Ropes & Gray (In re Bank of New England Corp.)*, 161 B.R. 557 (Bankr. D. Mass. 1993) (a 16.3-day difference in historical period and preference period average days to pay did not take payments outside the ordinary course).

   E.   **Factor 4: Collection Activity**

Unusual or extraordinary collection efforts can bring preference payments outside the ordinary course of business, "even when a differing payment interval alone is not enough to do so" under the third factor. *See Forklift Liquidating Trust v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 739 (D. Del. 2006) (citing *In re Molded Acoustical Products, Inc.*, 18 F.3d at 228). "Telephone calls and other communications may be considered unusual if they resemble a calculated response to a deteriorating creditor-debtor relationship." *In re FBI Wind Down, Inc.*, 581 B.R. at 143 (citations omitted); *compare In re Sierra Concrete Design, Inc.*, 463 B.R. 302, 304 (Bankr. D. Del. 2012) (late payment by certified check after several dunning phone calls was not made in the ordinary course), and *In re Am. Home Mortg. Holdings, Inc.*, 476 B.R. 124, 140 (Bankr. D. Del. 2012) (emails and telephone calls within an "established [internal] procedure" that applied to all clients were made in the ordinary course); *see also In re Sierra*

14

*Concrete Design, Inc.*, 463 B.R. 302, 305 (Bankr. D. Del. 2012) (late payment by certified check after several dunning phone calls was not made in the ordinary course).

The Parties disagree as to whether Defendant engaged in unusual collection activity to obtain the Transfers. Defendant asserts that it did not change its behavior during the Preference Period, and instead simply accepted regular loan payments as it had done in the past. ECF 14-3 at 10. Plaintiff suggests that the fact that the Loans were overseen for nearly the entire Historical Period by the head of Defendant's collections department evidences that unusual collections activity pervaded the relationship into the Preference Period. ECF 18-2 at 11. However, this assertion would appear to hurt Plaintiff's own argument: if the Loans were always in the workout department, then there is nothing unusual about them having been there during the Preference Period.

More significant are Plaintiff's assertions that, during the Preference Period, Defendant made "constant phone calls and demands for payments, after payments were late and overdue." ECF 18-2 at 7. Plaintiff avers that, during the Preference Period, Defendant's Member Solutions Manager, Judith Barta, called and emailed Debtor to notify Debtor of overdue monthly payments and attempt to collect said payments. ECF 18-1 ¶ 67. Plaintiff asserts that Debtor made at least one Transfer while on the phone with Barta, authorizing her to transfer funds directly from Debtor's checking account. ECF 18-1 ¶ 12; 18-2 at 4. Plaintiff contends that, by calling the Debtor to collect on loans secured against its principals' property, FRFCU effectively utilized its pre-existing leverage against the Debtor's principals and exposed personal assets to apply additional pressure. ECF 18-2 at 11.

Based on the foregoing, reasonable minds could differ regarding whether Defendant's collection efforts during the Preference Period constituted "unusual" collection activity, precluding summary judgment on Count I.

### F. Factor 5: Creditor Advantage

Neither party addresses this factor, and as such, it cannot outweigh the material dispute remaining regarding Defendant's collection efforts during the Preference Period. *See* § 547(c)(2)(A)(5).

For present purposes, the Court cannot conclude that the Transfers were made in the ordinary course of business between the parties due to disputes of material fact, and summary judgment as to Count I will therefore be denied.

### G. Fraudulent Conveyances

Plaintiff concedes that its claim that the Transfers were fraudulent conveyances is moot, as Defendant provided evidence that the Preference Period Transfers were all on account of antecedent debts. ECF 18-2 at 5, n. 3. Therefore, summary judgment as to Count II will be granted.

## V. CONCLUSION

A reasonable trier of fact could infer from this record that the Transfers do not fall under the ordinary course of business defense. Consequently, Defendant's Motion as to Counts I, III, and IV are denied. Because the undisputed materials facts establish that the Transfers do not constitute fraudulent conveyances under § 548 of the Bankruptcy Code, summary judgment as to Count II in favor of Defendant is granted.

Date: November 21, 2024

_____
Honorable Ashely M. Chan
United States Bankruptcy Judge

**TABLE 2.**

|  | **Plaintiff** | **Defendant** | **Court's Calculations** |
|---|---|---|---|
| *Pre-Preference or Historical Period (HP)* | November 2020 to December 10, 2021 (ECF 18-2 at 2) | March 11, 2021 to December 10, 2021 (ECF 14-3 at 2) | November 1, 2020 to December 10, 2021 |
| *Preference Period (PP)* | December 11, 2021 to March 11, 2022 (ECF 18-2 at 2) | December 11, 2021 to March 11, 2022 (ECF 14-2 at 4) | December 11, 2021 to March 11, 2022 |
| *Preference Period Transfers* | 1. 12/20/2021: $50,199.72<br>2. 1/19/2022: $50,199.72 or $50,220.73<br>3. 1/25/2022: $21.01<br>4. 3/2/2022: $50,199.72<br>5. 3/3/2022: $36.45<br><br>(ECF 18-1 ¶¶ 18, 54; ECF 18-6 Ex. D) | 1. 12/17/2021: $50,199.72<br>2. 1/19/2022: $50,199.72<br>3. 1/25/2022: $21.01<br>4. 3/2/2022: $50,199.72<br>5. 3/3/2022: $36.45<br><br>(ECF 14-2 ¶ 18-21) | 1. 12/17/2021: $50,199.72<br>2. 1/19/2022: $50,199.72<br>3. 1/25/2022: $21.01<br>4. 3/2/2022: $50,199.72<br>5. 3/3/2022: $36.45<br><br>(*See* ECF 14-9 Ex. F) |
| *Number of Transfers Included in PP Calculation* | 5 (ECF 18-1 ¶ 54) | 3: Transfer 1, Transfer 2, and Transfer 4 (ECF 14-2 ¶ 18-21) | 5 (*See* ECF 14-9 Ex. F) |
| *HP Average Late Payment Calculation* | First Loan: 181 or 183 days late total / 14 payments = 12.93 (ECF 18-1 ¶ 58; ECF 18-6 Ex. D)<br><br>P1: due 11/1/20, received 11/13/20=12<br>P2: due 12/1/20, received 12/3/20=2<br>P3: due 1/1/21, received 1/4/21=3<br>P4: due 1/1/21, received 12/30/20=0<br>P5: due 2/1/21, received 2/5/21=4<br>P6: due 3/1/21, received 3/16/21=15<br>P7: due 4/1/21, received 4/30/21=29 | First Loan: 146 days late total / 9 payments = 16.22 (ECF 14-2 at 6; *see* ECF 14-9 Ex. F)<br><br>P1: due 3/1/21, received 3/16/21=15<br>P2: due 4/1/21, received 4/30/21=29<br>P3: due 5/1/21, received 5/14/21=13<br>P4: due 6/1/21, received 6/18/21=17<br>P5: due 7/1/21, received 7/13/21=12<br>P6: due 8/1/21, received 8/16/21=15<br>P7: due 9/1/21, received 9/21/21=20 | First Loan: 167 days late total / 13 payment = 12.8 (*See* ECF 14-9 Ex. F)<br><br>P1: due 11/1/20, received 11/13/20=12<br>P2: due 12/1/20, received 12/3/20=2<br>P3: due 1/1/21, received 1/4/21=3<br>P4: due 2/1/21, received 2/5/21=4<br>P5: due 3/1/21, received 3/16/21=15<br>P6: due 4/1/21, received 4/30/21=29<br>P7: due 5/1/21, received 5/14/21=13<br>P8: due 6/1/21, received 6/18/21=17<br>P9: due 7/1/21, received 7/13/21=12<br>P10: due 8/1/21, received 8/16/21=15<br>P11: due 9/1/21, received 9/21/21=20<br>P12: due 10/1/21, received 10/12/21=11 |

17

| | | |
|---|---|---|
| P8: due 5/1/21, received 5/14/21=13<br>P9: due 6/1/21, received 7/1/21=30<br>P10: due 7/1/21, received 7/13/21=12<br>P11: due 8/1/21, received 8/19/21=18<br>P12: due 9/1/21, received 9/21/21=20<br>P13: due 10/1/21, received 10/12/21=11<br>P14: due 11/1/21, received 11/15/21=14<br><br>Second Loan: 192 days late total / 15 payments = 12.8 (ECF 18-1 ¶ 63; ECF 18-6 Ex. D)<br><br>P1: due 11/1/20, received 11/13/20=12<br>P2: due 12/1/20, received 12/3/20=2<br>P3: due 1/1/21, received 1/4/21=3<br>P4: 1/1/21, received 12/30/20=0<br>P5: due 2/1/21, received 2/5/21=4<br>P6: due 3/1/21, received 3/16/21=15<br>P7: due 4/1/21, received 4/30/21=29<br>P8: due 5/1/21, received 5/14/21=13<br>P9: due 6/1/21, received 6/21/21=20<br>P10: due 7/1/21, received 7/13/21=12<br>P11: due 8/1/21, received 8/25/21=24<br>P12: due 9/1/21, received 9/21/21=20<br>P13: due 10/1/21, received 10/12/21=11 | P8: due 10/1/21, received 10/12/21=11<br>P9: due 11/1/21, received 11/15/21=14<br><br>Second Loan: 150 days late total / 9 payments = 16.67 (ECF 14-2 at 7; *see* ECF 14-9 Ex. F)<br><br>P1: due 3/1/21, received 3/17/21=16<br>P2: due 4/1/21, received 4/30/21=29<br>P3: due 5/1/21, received 5/14/21=13<br>P4: due 6/1/21, received 6/21/21=20<br>P5: due 7/1/21, received 7/13/21=12<br>P6: due 8/1/21, received 8/16/21=15<br>P7: due 9/1/21, received 9/21/21=20<br>P8: due 10/1/21, received 10/12/21=11<br>P9: due 11/1/21, received 11/15/21=14<br>P10: due 11/1/21, received 11/17/21=16 | P13: due 11/1/21, received 11/15/21=14<br><br>Second Loan: 215 days late total / 13 = 16.5 (*See* ECF 14-9 Ex. F)<br><br>P1: due 12/1/20, received 12/30/20=29<br>P2: due 1/1/20, received 1/4/21=3<br>P3: due 2/1/21, received 2/18/21=17<br>P4: due 3/1/21, received 3/17/21=16<br>P5: due 4/1/21, received 4/30/21=29<br>P6: due 5/1/21, received 5/14/21=13<br>P7: due 6/1/21, received 6/21=20<br>P8: due 7/1/21, received 7/13/21=12<br>P9: due 8/1/21, received 8/16/21=15<br>P10: due 9/1/21, received 9/21/21=20<br>P11: due 10/1/21, received 10/12/21=11<br>P12: due 11/1/21, received 11/15/21=14<br>P13: due 11/1/21, received 11/17/21=16 |

|  | P14: due 11/1/21, received 11/15/21=14 P15: due 11/1/21, received 11/16/21=15 |  |  |
|---|---|---|---|
| *HP Average Days Late: First Loan* | 12.93 days late (ECF 18-1 ¶ 58; ECF 18-6 Ex. D) | 16.22 days late (ECF 14-2 ¶ 58) | 12.8 (*See* ECF 14-9 Ex. F) |
| *HP Average Days Late: Second Loan* | 12.80 days late (ECF 18-1 ¶ 63; ECF 18-6 Ex. D) | 16.67 days late (ECF 14-2 ¶ 63) | 16.5 (*See* ECF 14-9 Ex. F) |
| *HP Range of Days Late* | 0-30 (ECF 18-2 ¶ 18) | 11-29 (ECF 14-2 ¶ 66) | 2-29 (*See* ECF 14-9 Ex. F) |
| *PP Range of Days Late* | 18-30 (ECF 18-2 ¶ 19) | 16-30 days (ECF 14-3 at 3) | 16-30 (*See* ECF 14-9 Ex. F) |
| *PP Average Days Late* | 24 (ECF 18-2 ¶ 16) | 21 (ECF 14-2 ¶ 55) | 23.4 (*See* ECF 14-9 Ex. F) |
| *PP Average Late Payment Calculation* | (19+18+24+29+30) / 5 = 24 (ECF 18-1 ¶ 55) | (16+18+29) / 3 = 21 (ECF 14-2 ¶ 55) | (16+18+24+29+30) / 5 = 23.4 |
| *Difference in Average Lateness Between HP and PP: First Loan* | 24 – 12.93 = 11.07 (ECF 18-1 ¶ 60) | 21 – 16.22 = 4.78 (ECF 14-2 ¶ 60) | 23.4 – 12.8 = 10.6 (*See* ECF 14-9 Ex. F) |
| *Difference in Average Lateness Between HP and PP: Second Loan* | 24 – 12.80 = 11.20 (ECF 18-1 ¶ 65) | 21 – 16.67 = 4.33 (ECF 14-2 ¶ 65) | 23.4 – 16.5 = 6.9 (*See* ECF 14-9 Ex. F) |